**CHEMICAL WEAPONS WORKING GROUP INC., et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF the ARMY, et al., Defendants.**

2:96–CV–425C.

The United States District Court, D. Utah, Central Division.

Aug. 13, 1996.

Mick G. Harrison, Robert Ukeiley, Ashley Schannauer, Greenlaw, Inc., Bloomington, IN, Robert Guild, Columbia, SC, Richard Condit, Washington, D.C., Paul Van Dam, Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah, Randall M. Weiner, Land And Water Fund of the Rockies, Boulder, Colorado, for plaintiffs.

Alan David Greenberg, Robert H. Foster, U.S. Department of Justice, Environmental Defense, Denver, CO, Lisa Ann Holden, U.S. Department of Justice, Environmental & Natural Resources Division, Washington, D.C., Stephen L. Roth, Assistant U.S. Attorney, U.S. Attorney's Office, District of Utah, Salt Lake City, Utah, for Department of the Army and United States Department of Defense.

Craig D. Galli, David W. Tundermann, Michael A. Zody, Parsons, Behle, & Latimer, Salt Lake City, Utah, for EG & G Defense Materials, Inc.

## MEMORANDUM DECISION AND ORDER

CAMPBELL, District Judge.

On May 10, 1996, plaintiffs filed this suit challenging defendants' proposed operation of the Tooele Chemical Agent Disposal Facility (TOCDF). The amended complaint alleges that defendants have violated the National Environmental Policy Act (NEPA), the Resource Conservation and Recovery Act (RCRA), the Toxic Substances Control Act (TSCA), the Defense Authorization Act, and the Clean Water Act; and that defendants' operation of TOCDF will constitute a nuisance under Utah law. The court has granted defendants' motions to dismiss certain of the counts. Remaining for disposition in this case are plaintiffs' claims (1) that defendants are in violation of NEPA for failing to supplement the necessary environmental impact statements in light of substantial new information regarding the project and due to substantial changes having been made to the project, (2) that the operation of TOCDF will violate TSCA due to defendants' failure to show that the TOCDF incinerator will destroy the chemical warfare agent at the required level of efficiency, and (3) that the operation of TOCDF will constitute a nuisance.[1]

On June 12, 1996, plaintiffs filed a motion for preliminary injunctive relief, seeking to enjoin defendants from beginning preliminary incineration tests of chemical warfare

---

1. This claim was subject to a motion to dismiss by all defendants, and the court dismissed the claim as against the federal defendants on immunity grounds. The court took defendant EG & G Defense Material, Inc.'s motion to dismiss this count under advisement.

agent.[2] A hearing on plaintiffs' motion for a preliminary injunction was held over several days from July 22, 1996, through August 2, 1996. Having considered the evidence presented at that hearing, the memoranda filed by the parties, and the relevant law, the court denies plaintiffs' motion and enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

**Background**

1. The United States has a stockpile of 30,000 tons of chemical warfare agent manufactured during and after World War II, which is stored at eight sites in the United States, including the Tooele Army Depot at Tooele, Utah. Forty-four percent of this stockpile is stored at Tooele. There are three types of chemical agent stored at Tooele: a blistering agent known as mustard and two nerve agents known as "GB" and "VX." This agent is stored in over 1.1 million separate containers in three basic configurations: (1) projectiles, cartridges, mines, and rockets containing propellant and/or explosives (referred to generally as "energetics"); (2) other projectiles that do not contain energetics; and (3) spray tanks and large steel bulk storage containers known as "ton containers."

2. Continued storage of these dangerous weapons poses significant problems. The stockpile is vulnerable to catastrophic events such as earthquakes or airplane crashes, which could result in a fatal release of agent. As the stockpile of chemical munitions ages, it presents increasing dangers due to leakage of the containers and destabilization of rocket propellants. The M55 rockets which form a part of the munitions stored are of particular concern, as the stabilizer in the rocket propellant degrades slowly over time, creating an increased risk of shock sensitivity. In addition, there is some indication that leaking chemical agent may cause corrosion which could lead to accidental arming of a rocket's fuse. Of the approximately 30,000 rockets

stored at Tooele Army Depot, approximately 1,000 have been identified as "leakers." In addition, leakage of GB nerve agent from ton containers has been cited as a significant risk.

3. In the Department of Defense Authorization Act of 1986, Pub.L. No. 99–145, Title XIV, Part B, Sec. 1412, 99 Stat. 583 (1985) (codified as amended at 50 U.S.C. § 1521), Congress mandated that the stockpile of chemical warfare agent be destroyed by September 30, 1994. *See* 50 U.S.C. § 1521(a). This deadline has since been extended to December 31, 2004. 50 U.S.C. § 1521(b)(5)(Supp.1996). Congress directed the Army to accomplish the destruction of this agent in such a manner as to provide (1) maximum protection of the environment, the general public, and the personnel who will be involved in the destruction process; (2) adequate and safe facilities designed solely for the destruction of the chemical agent; and (3) cleanup, dismantling, and disposal of the facilities when the disposal program is complete. 50 U.S.C. § 1521(c)(1).

4. The Army determined that the "baseline" technology for destruction of these weapons is on-site incineration at each of the storage facilities. The Army has considerable experience with large-scale incineration of agent materials. In 1979, the Army began operation of the Chemical Agent Munitions Disposal System pilot facility (CAMDS), located at the Tooele Army Depot. CAMDS was built to evaluate incineration and neutralization disposal methods. By 1988, CAMDS had incinerated 75,000 pounds of GB, 8,000 pounds of VX, and 38,000 items of munitions. CAMDS continues to be used for testing. The Army has also been operating an incineration facility at Johnston Atoll (JACADS) for six years and during that time has destroyed over two million pounds of agent and over nine million pounds of drained containers and dunnage. The operation of JACADS has been successful and generally free of significant incidents or risk.

---

**2.** When defendants later obtained final permits to begin testing the TOCDF incinerator, plaintiffs filed a motion for a temporary restraining order. Defendants agreed to refrain from beginning test

burns of chemical warfare agent pending this court's resolution of the motion for preliminary injunction.

## NEPA Compliance Process

5. In order to evaluate the environmental effects of the proposed destruction of chemical munitions and agent, the Army completed and circulated a Draft Programmatic Environmental Impact Statement in 1986 (DEIS). This document evaluated the impacts of disposal of the stockpile as against continued storage. In 1988, the Army issued the Final Programmatic Environmental Impact Statement (FPEIS) and the Record of Decision (ROD). Incineration was selected for the disposal program. Other destruction technologies were rejected as either unreasonable or immature and unproven.

6. The DEIS and FPEIS were national in scope and did not focus on a particular site. In the ROD, the Army committed to conducting site-specific NEPA reviews for each of the eight stockpile locations. Consequently, in 1988, the Army prepared a Phase I Report at Tooele which concluded that the FPEIS on-site destruction alternative remained valid for Tooele. In 1989, the Army prepared a draft environmental impact statement to address the environmental impacts resulting from the construction and operation of TOC-DEF. After public comment and review, the Army issued a Final Environmental Impact Statement for Tooele (FEIS) and a ROD in 1989. On-site incineration was selected as the preferred alternative.

7. On July 13, 1996, the Army, through Major General Robert D. Orton, Program Manager for Chemical Demilitarization, adopted a Record of Environmental Consideration (REC) which found that "no new and significant information has appeared since the signing of the Chemical Demilitarization Programmatic EIS and Tooele Site–Specific EIS and associated RODs that requires completion of a supplement (sic) environmental impact statement." This document was based on an attached 84 page report which evaluated new information on dioxin emissions, alternative technologies, and baseline incineration. "Evaluation of Information on Dioxin Emissions, Alternative Technologies and Baseline Incineration" (hereinafter, "REC Report").

## The Prototype Facility: JACADS

8. As part of the further development of its incineration plan, the Army constructed JACADS as a full-scale operational incineration plant, intended to serve as a prototype for the eight planned incinerator facilities located in the continental United States, including TOCDF. The February 28, 1988 ROD, which memorialized the Army's decision to adopt incineration as the baseline technology for agent destruction, discusses the role of JACADS in the development of the incinerator technology, and states that the Congressional mandate of agent destruction by 1994 would of necessity be postponed in order to evaluate the incineration process as conducted at a full-scale operation such as JACADS and implement changes to later incinerator plans in light of that experience. The National Defense Authorization Act of 1989, Pub.L. No. 100–456 (1988), required the Army to complete Operational Verification Testing (OVT) of JACADS before proceeding to destroy the stockpiles of chemical agent and munitions in the continental United States. Before it could proceed with its destruction program, the Army was required to certify to the Secretary of Defense and subsequently to Congress that the JACADS operation had been successful. The Secretary of Defense certified to Congress that OVT at JACADS had been completed in August, 1993.

9. The MITRE Corporation was retained by the Army to monitor, evaluate, and report the results of all phases of OVT. In 1987, the National Research Council's standing Committee on Review and Evaluation of the Army Chemical Stockpile Disposal Program (Stockpile Committee) was formed to provide the Army with technical advice on the disposal program. The Stockpile Committee was chartered to monitor OVT at JACADS and to review the results of OVT as reported by the MITRE Corporation.

10. The MITRE OVT reports found that, although there were events that occurred at JACADS that increased the probability of agent exposure or injury to workers, JACADS met the OVT safety performance goals. Similarly, although the Stockpile Committee found problems with the JA-

CADS operations, none were "show stoppers."

11. The operation and problems arising out of the operation of JACADS were discussed in the REC Report. The report concluded that, although the operation was not flawless, the program had effectively and safely disposed of chemical agent and munitions and that the JACADS operation had not revealed any new or significant information to indicate that operation of TOCDEF would create significant environmental impacts not contemplated in the site-specific Tooele FEIS.

12. Over 2 million pounds of agent have been processed at JACADS, including 1.8 million pounds of GB, 141,000 pounds of VX, and 250,000 pounds of mustard. JACADS has also processed 1.7 million pounds of energetics, and over 9 million pounds of drained containers and dunnage. Problems which have occurred at JACADS during its operation have been investigated, analyzed, and used in a "lessons learned" program. Through the lessons learned program, modifications and changes have been incorporated in the design of the facility and the operation procedures of TOCDEF.

**TOCDEF**

13. TOCDEF has five separate incinerators. Two liquid incinerators (LIC) will be used to incinerate liquid agent that is drained from munitions and bulk containers. The LIC destroys agent by burning it as a fuel after it is mixed with natural gas and air. A Deactivation Furnace System (DFS) will be used to incinerate munitions containing energetics, such as rockets and land mines, which have been drained of agent but are still contaminated. A Metal Parts Furnace will be used to thermally decontaminate non-energetic metal parts that have been drained of agent, such as ton containers. A Dunnage Incinerator (DUN) was planned for burning non-agent-contaminated and agent-contaminated dunnage, such as pallets and used carbon filters. The DUN is presently not operational and the dunnage will be stored on the Tooele facility until the DUN begins operations. A Brine Reduction Area was designed to treat slag from the wet pollution abatement system. Problems have been encoun-

tered with this system and current plans are to begin operations at TOCDEF without it.

**Regulatory Compliance**

14. The Army has been in the process since 1986 of obtaining the numerous necessary permits to operate TOCDEF. It began the process by submitting to the Executive Secretary of the Solid and Hazardous Waste Control Board within the State of Utah's Department of Environmental Quality its application for a hazardous waste operation plan for TOCDF. The Executive Secretary published a draft plan for TOCDEF in April 1989. The Executive Secretary then conducted public hearings on the proposed plan and approved the proposed plan in June 1989. Since the initial approval, the Executive Secretary has approved numerous modifications to reflect changes in the design and operation of the incinerators, often to reflect the lessons learned from JACADS.

15. TOCDEF has obtained a RCRA permit to operate from the State of Utah under Utah's delegated program. TOCDF has obtained a Clean Air Act permit, also from the State of Utah. The United States Environmental Protection Agency (EPA) regulates the disposal of polychlorinated biphenyls (PCBs) found in the shipping and firing tubes. TOCDEF is also subject to health and safety regulations such as OSHA.

**Trial Burns**

16. The Army completed construction of TOCDEF in July 1993. Before becoming fully operational, TOCDEF is required by RCRA and TSCA to undergo a series of trial burns to determine whether the facility can destroy agent and other materials without releasing a significant amount of toxics into the environment. TOCDEF has completed two trial burns for the LIC and the DFS: a "shakedown burn" with no agent and an "R & D Burn" with no agent. The two trial burns remaining are to be conducted with agent. The destruction removal efficiency (DRE) for each of the two completed tests was in excess of the 99.9999% required under RCRA, and the State of Utah approved the results of both tests.

17. The shipping and firing tubes of the M55 rockets are the only source of PCBs to

be incinerated at TOCDEF. This will be done in the DFS. Pursuant to its TSCA permit, issued by the EPA, TOCDEF conducted a trial burn of M55 rockets, without agent, in the DFS and achieved a DRE of at least 99.9999%. EPA has approved the test results and has now authorized TOCDF to proceed with trial burns of agent-containing rockets.

**Accidents and Equipment Failures**

18. The Army's experience in operating JACADS and the implications of that experience for the proposed operation of TOCDF form the basis for part of plaintiffs' claim that there is significant new information regarding the environmental effects of TOCDF that have not been evaluated in a supplemental EIS. Accordingly, the specifics of various alleged incidents at JACADS and the defendants' implementation of corrective measures at TOCDF to address such problems has been the subject of dispute between the parties in this case.

19. In support of their allegation that significant problems have arisen in the operation of JACADS that have not been addressed or corrected at TOCDF, plaintiffs have submitted evidence in the form of records and reports dealing with JACADS operations and the testimony of Mr. Steve Jones, who was employed by the Army Inspector General's Office as a Safety and Occupational Health Manager. Plaintiffs question the effectiveness of the lessons learned program, and cite several examples of JACADS problems which are alleged to have been left uncorrected at TOCDF. However, the court finds that many of these allegations are largely based on hearsay evidence provided by Steve Jones, or that the cited problems were, in fact, addressed by defendants in the process of construction and systemization of TOCDF. For each of the allegations made regarding equipment and procedural failures at JACADS and TOCDF, no matter how thinly supported by evidence by plaintiffs, defendants have presented affirmative evidence that indicates that the problems either do not exist or that corrective actions have been taken in constructing and testing the systems at TOCDF. For example, Mr. Jones states in his declaration that deteriora-

tion of firebricks caused an explosion at JACADS and offers a theory about how this could occur. But no source for this information is cited, and plaintiffs do not present any evidence as to whether any alleged problem with firebricks continues at TOCDF. Robert Perry, Chief of Risk Management, Quality Assurance Office within the Office of the Program Manager for Chemical Demilitarization, testified that no such explosion had occurred. Mr. Perry testified that the only problem with the firebricks was erosion of the brick over time. Mr. Jones states in his declaration that he "observed" problems with blast gates at both JACADS and TOCDF, but cites only incidents alleged to have occurred at JACADS, and Mr. Jones acknowledged that he has no personal knowledge of such incidents. Mr. Jones testified concerning a number of design and operation deficiencies in equipment at TOCDF, but has no qualifications regarding equipment design, and has no knowledge as to the current status of the equipment to be used at TOCDF. Ultimately, the court finds that the importance and/or credibility of Mr. Jones' allegations are questionable in light of his lack of personal knowledge regarding many of them, and his failure to report many of these occurrences at the time he allegedly learned of them.

20. Defendants acknowledge that there have been three confirmed atmospheric releases of live agent, but these releases were minimal and posed no risk of harm to JACADS employees or to the environment. Each of these releases were investigated and changes were made in equipment, design, and operations in order to address the problems. These changes were also implemented at TOCDF as part of the lessons learned program. *See, e.g.,* REC Report, p. 3–5 (Modifications and changes to the LIC agent line/nozzle purge system design, purging sequence and LIC agent nozzle removal procedure implemented in response to agent release on December 8, 1990). Defendants also confirmed that one employee was slightly injured by a nerve agent spill within the facility, but the testimony of Robert Perry indicated that this accident was caused by a failure to follow standard procedures.

**Dioxin hazards**

21. It is not disputed that the incinerators at TOCDF will create and release dioxins to the environment. Plaintiffs assert that there is new information regarding the overall effects of dioxin exposure and the exposure levels at which dioxin becomes harmful, and that the dioxin risks associated with the operation of TOCDF to particular individuals (especially infants) living in the vicinity of the plant have not been adequately evaluated.

22. The evidence indicates that the existence and amount of the health risks associated with exposure to background levels of dioxin, and the likely significance and effects of the incremental increases in the dioxin levels due to the operation of TOCDF, are largely uncertain. The conflicting opinions offered by the experts who presented testimony in this case emphasize the fact that the effects of dioxin at various levels of exposure are far from settled issues within the scientific community. Plaintiffs rely to a great extent on the draft document "Health Assessment Document for 2,3,7,8 Tetrachlorodibenzo-p-Dioxin (TCDD) and Related Compounds" (Dioxin Reassessment) issued by EPA in 1994, which by its terms is not to be cited or quoted. Certain of the findings in the Dioxin Reassessment were questioned in significant areas by EPA's Science Advisory Board in 1995. The document is still under review and does not currently represent a final position of the EPA.

23. Plaintiffs also rely on a "reference dose" of 1 picogram/kg/day level noted by the Agency for Toxic Substances and Disease Control (ATSD) in 1989 to establish harm to humans. However, this reference dose is derived by dividing the lowest level at which adverse effects are shown in animals by 1,000 in order to conservatively account for unknown factors. Accordingly, although this "reference dose" may indicate a safe level for exposure, it does not follow that exceeding this level is likely to result in harm. The EPA Dioxin Reassessment itself states that the use of such a reference dose would be "inappropriate" and of "doubtful significance." Dioxin Reassessment, p. 9–84. The evidence presented indicates that this level of exposure is already exceeded in most industrialized areas of the world. Although plaintiffs argue that any increase in the levels of dioxin exposure is unacceptable, the danger associated with relatively small increases is far from certain, and the evidence presented by plaintiffs is insufficient to support a finding that such danger is likely to be significant.

24. Prior to approving trial burns of chemical agent at TOCDF, the State of Utah Department of Environmental Quality (DEQ) performed a screening health risk assessment which analyzed the impacts on human health and the environment resulting from the expected emissions from TOCDF. The assessment followed EPA guidance in adopting conservative assumptions. The assessment modeled TOCDF emissions by using maximum JACADS levels and increasing them to account for the greater capacity at TOCDF. The assessment also assumed that emissions at TOCDF would be twice the JACADS detection limits for the many compounds which were not detected. Concerning dioxin, the assessment also made the conservative assumption that all dioxin emissions consist of only the 17 types of dioxins (out of 210 possible) that have been determined to be toxic.

25. The Utah DEQ used these assumptions to calculate the potential exposures to hypothetical individuals residing within six miles north (usually downwind) of TOCDF. Assuming simultaneous operation of all five furnaces at TOCDF, the overall cancer and non-cancer risks were at or below EPA screening risk levels. As far as the cancer effects of dioxin, the risk assessment found that EPA guidance levels were not exceeded for 10, 15, and 30 year operating periods. The risk assessment did not calculate non-cancer effects of the dioxin exposure because there is currently no applicable reference dose for dioxin, as indicated above. Defendant's expert, Dr. Finley, calculated average daily intakes of dioxin for the scenarios used in the Utah DEQ assessment and concluded that the exposures should be below the level of concern for non-cancer effects.

26. The Utah DEQ assessment had originally included in a draft form scenarios regarding a subsistence farmer and a breast-

feeding infant. This report was not released to the public. Instead of the subsistence farmer scenario, the final form of the DEQ assessment considered three farmer scenarios based on a survey of actual farming practices in the area,[3] and simply deleted the breast-feeding infant scenario. Plaintiffs presented evidence that risks of dioxin exposure are particularly high for a breast-feeding infant and question the deletion of this scenario from the Utah DEQ assessment. However, defendants' experts calculated the exposure risks for a breast-feeding infant and found that such exposures would result in only nominal increases of dose and risk, and would be at or below levels deemed acceptable under current EPA guidelines. Ultimately, the court finds that the Utah DEQ assessment is intended to show an area of safety, not predict an actual level of risk. Although plaintiffs have shown that the assumptions applied in the State's health risk assessment may indicate a higher level of risk for some hypothetical persons, this does not constitute a showing that there is an actual risk to some person or persons posed by the emissions levels predicted for the facility.

**Alternative Technologies**

27. Plaintiffs have submitted evidence regarding several alternative processes or technologies which could be used to destroy the chemical weapons, and which plaintiffs assert offer significant safety and efficiency advantages over incineration. Indeed, it appears that many of these technologies have been developed in response to Army requests for alternatives to the incineration technology adopted at TOCDF.

28. In 1992 and 1993, the National Research Council undertook a major study to reevaluate the Chemical Disposal Program and the progress of alternative technologies. As part of this process, the NRC held a public forum to address the criteria for evaluating these alternatives. The NRC's 1994 Report endorsed the Army's choice of incineration, finding that there is no currently feasible alternative for disposal of energetics,

but recommending that the Army continue to evaluate these technologies for sites other than the Tooele stockpile. There has been no change in the NRC recommendation of incineration as the preferred technology at Tooele. On June 4, 1996, Dr. Magee, Chairman of the Stockpile Committee, stated in his testimony before Congress: "To sum up, the Stockpile Committee has endorsed the baseline incineration system as the technology to accomplish the overall chemical stockpile disposal program effectively and expeditiously. However, the committee by its recommendations regarding alternative technologies left open the door for the possible employment of a technology other than incineration at selected sites, depending on comparative factors of safety, performance and implementation schedule." *Quoted in* REC Report, p. 43.

29. In August 1995, the Army requested submissions by commercial vendors for technologies to use at the sites that store only ton containers of chemical agent. Three promising technologies were chosen and are currently being studied by the Army and the NRC: High Temperature Gas Phase Reduction (Eco–Logic), Molten Metal Catalytic Extraction Process (M4) and Electrochemical Oxidation (AEA). The companies' own conceptual designs indicate that it would take a minimum of three years to implement any of these technologies for disposal of ton containers at the Aberdeen and Newport sites, and Defendant's expert, Dr. Francis W. Holm, estimated that implementation of these methods could take longer. Each of these technologies has tested only a small amount of live nerve agent on a laboratory scale. These technologies have not been tested using any munitions such as are present at the Tooele stockpile. Dr. Holm testified that a conservative estimate of the time required for implementation of these technologies at Tooele would be 6.5 years.

30. Plaintiffs have presented a great deal of evidence regarding the advantages, both in terms of cost and safety, of these alternative technologies. Plaintiffs disagree with defen-

---

**3.** This is apparently a standard practice in creating risk assessments; if a "worst case" hypothetical person appears to have an unacceptable risk, the assumptions are made more realistic (less conservative) by conducting a survey of the actual area being assessed.

dants' estimates regarding the readiness of these alternatives to begin processing chemical agent, questioning many of the assumptions which underlie Dr. Holm's 6.5 year estimate. Plaintiffs argue that the existing facility could be adapted to an alternative technology and that permit modifications could be obtained instead of starting the RCRA permit process from scratch. Plaintiffs also cite to the time estimates provided by the private companies promoting these technologies as evidence that, for example, M4 and Eco–Logic could be operational within about 4 years. Plaintiffs also submit evidence of recent developments which questions the Army's assumptions regarding the lack of readiness of these technologies and argue that although the alternative technologies' ability to process energetics is relatively untested, dual use of both incineration and an alternative could be implemented.

### CONCLUSIONS OF LAW

■ 1. Plaintiffs bear the burden in this case of establishing the need for injunctive relief. In making its determination regarding the necessity of the injunction, the court must consider four factors: (a) whether plaintiffs have shown a substantial probability of success on the merits; (b) whether plaintiffs are threatened with irreparable injury in the absence of an injunction; (c) whether plaintiffs' potential injury outweighs any damage to defendants; and (d) whether the injunction would be adverse to the public interest. *Potawatomi Indian Tribe v. Enterprise Management Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir.1989); *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980). If plaintiffs are able to show that they will suffer irreparable injury and that "the balance of hardships tips decidedly in [their] favor," the requirement of showing a substantial probability of success on the merits is satisfied by raising "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate inquiry." *Lundgrin*, 619 F.2d at 63 (*quoting Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 781–82 (10th Cir.1964)).

**Irreparable Injury**

■ 2. Mere threatened, speculative harm, without more, does not amount to irreparable injury for purposes of justifying preliminary injunctive relief such as that sought by plaintiffs. *E.g., Mullis v. United States Bankruptcy Court*, 828 F.2d 1385 (9th Cir.1987), *appeal dismissed, cert. denied*, 486 U.S. 1040, 108 S.Ct. 2031, 100 L.Ed.2d 616 (1988); *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985) (movant must show that irreparable injury is "both certain and great; it must be actual and not theoretical"). Unlike most cases alleging violations of NEPA, plaintiffs in this case do not assert the sort of environmental harm due to construction which is usually seen as irreparable. TOCDEF is already fully constructed, so all of Plaintiffs' asserted irreparable harm in this case is related to the alleged health risks of incineration, due to either emissions from normal operations, or agent releases due to accidents.

*Dioxin exposure risks*

■ 3. The harm cited by plaintiffs resulting from increased dioxin exposure is based on extrapolations from conservative hypothetical scenarios used by the Utah DEQ in compiling their health risk assessment. As noted above, the methodology used for determining the nature of the risks by Utah DEQ is able to calculate safe levels of exposure, but does not determine levels at which harm is likely to occur. Although plaintiffs are able to put forward a scenario in which a breast-feeding infant would be exposed at levels significantly higher than levels determined by Utah DEQ to be safe, they have not submitted evidence that any plaintiff, or any person at all, would in fact be placed at risk by the projected dioxin emissions from TOCDF. The court finds that the asserted risks of harm due to dioxin exposure are too speculative to qualify as irreparable harm to plaintiffs.

*Operational Risks*

4. Defendants assert that the operation of TOCDF will result in immediate risks to workers and the public from accidental releases of agent. Plaintiffs have a difficult

case to make on this issue in light of the safety record at JACADS and the independent evaluations of JACADS, as noted above, which found no significant risks associated with JACADS. Plaintiffs' experts testified that the risks associated with the agent processing at JACADS and TOCDF have been underestimated or improperly evaluated for various reasons, including a lack of adequate monitoring equipment and failure to evaluate true worst-case scenarios. However, the fact remains that during its entire operation, only one minor worker injury due to agent processing was reported. Although three releases of live agent were reported, these did not result in any injury. Plaintiffs may be correct that the risks associated with operating TOCDF have been underestimated to some unspecified degree. However, there is no evidence that human injury is inevitable or even likely pending the court's final resolution of this case. Accordingly, the court finds that operational risks cited are too speculative to support a finding of irreparable injury to plaintiffs.

*NEPA Harm*

■ 5. The purpose of NEPA is to ensure that the agency and the public are aware of the environmental consequences of a project before beginning the project. *Sierra Club v. Hodel,* 848 F.2d 1068, 1097 (10th Cir.1988). Courts have noted that the harm from proceeding with a project without completing the necessary NEPA evaluation is irreparable in that once a decision has been made and implemented, NEPA's purpose of making certain that decision makers have all relevant information *prior* to making final decisions would be thwarted. *Id.; Sierra Club v. Marsh,* 872 F.2d 497, 503–04 (1st Cir.1989). This is not an injury arising out of the substance of the decision that has been made or its effects; it is a procedural interest in protecting the processes established by NEPA and providing the decision maker with all the relevant information. In this case, the alleged NEPA harm does not arise out of the decision to construct TOCDF, a decision that was made and implemented long ago. Rather, the decision which plaintiffs seek to enjoin is the Army's decision to operate the incinerator during the approximately one year before a final trial on the merits. During this period, the Army will be conducting the remaining trial burns, carried out with live agent. The court finds that, pending final resolution of this case, such injury will occur during only a small portion of the expected operating lifetime of TOCDF, and is therefore relatively minimal.

**Balancing of Harms**

■ 6. Even if the court assumes that the risks cited by plaintiffs are sufficiently likely so as to qualify as irreparable harm, the court must balance those risks against the risks and harms asserted by defendants. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1802–03, 72 L.Ed.2d 91 (1982). In 1987, the Army completed a comprehensive quantitative risk analysis that evaluated the risks of accidents and catastrophic events as they relate to the proposed alternatives. The report concluded that the risk of continued storage was greater than the risk of processing. In 1995, the quantitative risk assessment was updated to address information specific to TOCDF. The updated analysis confirmed the Army's earlier conclusion that the risks of fatalities associated with one estimate of the entire period of TOCDF operations (6.2 years) were equaled by the same risks associated with only eleven days of storage. For individuals living closest to TOCDF, the risks resulting from continued storage are one-hundred times greater than the risks resulting from disposal operations. It is true that this quantitative risk assessment does not include calculations for non-catastrophic long-term exposures to pollutants, but it is also true that the significance of those risks (whatever they might be) must only be considered in the context of the time required for a final decision in this case.

7. This is not a case in which the harm to the environment and the public posed by a proposed government action is definite; the Army is not seeking to divert a river or level a forest. Rather, the harm plaintiffs seek to prevent pending final disposition of this case is speculative and subject to conflicting expert testimony. The Army and other independent consultants have evaluated the relative risks and have concluded that the risks

of storage outweigh the risks associated with operation of TOCDF. The court is left, then, with the issue of whether harm to the NEPA process itself is a sufficient allegation of harm to support the injunction. As noted above, the action plaintiffs are seeking to enjoin is the daily operation of TOCDEF for approximately one year pending a final decision in this case, a period of time during which the test burns with live agent will be carried out. If, after trial, it is determined that supplementation of the EIS is necessary, this supplementation can still take place and be just as effective as it would be now, since the NEPA harm would be minimal. In fact, it appears that the test burns will themselves provide information useful to the evaluation of the environmental impact resulting from the operation of TOCDEF. Plaintiffs are challenging the operation of this facility, which is, in effect, a daily decision to burn chemical agent which can always be stopped and reevaluated in light of information presented in a supplemental EIS if the court finds that such is required after a trial on the merits. The court finds that the balancing of harms favors denial of the preliminary injunction.

## Likelihood of Success on the Merits

### NEPA Claims

■■■ 8. NEPA requires that an EIS be prepared for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The duty to make certain that decision makers are presented with all relevant information is an ongoing one which does not end when an initial EIS is prepared. Regulations promulgated by the Council on Environmental Quality require that an EIS be supplemented when an agency makes substantial changes to the project or when there are significant new circumstances or information relevant to the project and its impacts. 40 C.F.R. §§ 1502.9(c)(1)(i) and (ii). In this case, although the facility which was the subject of the original EIS has already been constructed, the daily operation of TOCDF will itself constitute a "major federal action" that would require a supplemental EIS if "new information is sufficient to show that the remaining action will 'affect the quality of the

human environment' in a significant manner or to a significant extent not already considered." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377. In order to provide a means for documenting the agency's evaluation of the significance of new information or changes made to a project in situations where such information or changes have been "adequately assessed in existing documents and determined not to be environmentally significant," the Army has promulgated regulations which provide for the preparation of a REC. 32 C.F.R. § 651.14(a).

■■■ 9. Plaintiffs challenge the weight to be given to the Army's July 13, 1996 REC, questioning both the adequacy and the sincerity of the review found in the REC. According to plaintiffs, the timing of the REC makes it suspect. The REC is based on an attached report which was apparently completed one day before its adoption in the REC and was first made public as an exhibit to defendants' memorandum in opposition to this motion for a preliminary injunction. The REC is obviously directed to making findings regarding the precise claims raised by plaintiffs in this case, and plaintiffs argue that the court should not give the usual deference to the factual findings in the REC because it was prepared in the course of litigation. However, although the court is not blind to the adversarial context in which this document was prepared, the REC represents the considered position of the public official charged with making the decisions regarding TOCDF operations and determining the significance of any new information brought forward. The REC is based on a lengthy report which evaluates the facts plaintiffs claim should affect the decision. There is no evidence that the experts whose opinions underlie the REC were merely advocates preparing litigation documents. The court also notes that in *Marsh*, the Supreme Court, without discussion of the timing, gave deference to a Supplemental Information Report (a document similar to a REC) which had been prepared by the Army Corps of Engineers in January 1986, several months after the plaintiffs had filed suit. *See* 490 U.S. at 379–80, 109 S.Ct. at 1862–63. The

Army's decision, as stated in the REC, that a supplemental EIS is not required before operations begin at TOCDEF, is subject to a only a limited review by this court. The *Marsh* Court held that under the provisions of the Administrative Procedures Act, 5 U.S.C. § 706, a challenge to an agency decision regarding the significance of alleged changes is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Id.* at 376, 109 S.Ct. at 1860. "Accordingly, as long as the [agency] decision not to supplement the [EIS] was not 'arbitrary or capricious,' it should not be set aside." *Id.* at 377, 109 S.Ct. at 1861. The court's responsibility in this case is to review the record and satisfy itself that "the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information [or circumstances]." *Id.* at 378. It is clear that "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decision making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Id.* at 373, 109 S.Ct. at 1859.

*New information regarding safety of TOCDF based on JACADS experience*

10. Plaintiffs argue that the documentation of the performance of the incineration facility at JACADS and the testimony of Steve Jones constitutes new information which should be evaluated in a supplemental EIS. However, the court finds that these allegations do not constitute new information not already considered. It is true that perfection was not achieved at JACADS and that various problems were encountered there with both equipment and personnel. However, such problems were anticipated and planned for; JACADS was meant to expose such problems in order to implement solutions at TOCDF. To the extent that JACADS operations revealed problems with the baseline incineration technology, measures were taken to correct the problems. The ROD for the FPEIS contemplated that problems would occur at JACADS which could then be remedied at the stockpile incineration sites in the Continental United States, including TOCDEF. In addition, most of the allegations raised by Mr. Jones (if assumed to be true) appear to be relatively minor issues that, in the context of overall operations at TOCDF, would not constitute significant new information, even in the aggregate. In any event, the REC indicates that the Army has investigated the more serious operational allegations raised in this case and found that they were not significant, or that the problems cited have been adequately mitigated. The Army's analysis of these problems appears to be thorough and reasonable.

11. In addition, plaintiffs allege that defendants have failed to evaluate the significance of changes made to the plans for operation of TOCDF; specifically, that defendants have not analyzed the dangers associated with "co-processing" both explosive munitions and ton containers at the same time. However, defendants presented evidence that co-processing risks have in fact been considered and that the quantitative risk analysis (currently in draft form) has indicated that any increase in risks associated with co-processing is negligible. The Army's experts have concluded that the TOCDF quantitative risk analysis shows that "the storage risk is significantly larger than that posed by the disposal process (greater than 10 fold)." REC Report at 12.

*New information regarding dioxin harms.*

12. Plaintiffs point to recent information regarding the effects of dioxin and the 1994 EPA draft dioxin reassessment as constituting new information which must be considered through in a supplemental EIS. However, the EPA 1994 dioxin reassessment's analysis is at best an indication that the debates regarding the effects of dioxin are still ongoing. The wide range of expert testimony presented to the court during the hearing on plaintiff's motion makes clear that the seriousness of the dioxin threat is far from settled. In considering the likelihood of plaintiff's success on the merits of this claim, this court is guided by the Supreme Court's observation in *Marsh* that a determination of whether new information is significant is an

issue that the agency is to resolve. As in *Marsh,* "[b]ecause analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'" 490 U.S. at 377, 109 S.Ct. at 1861 (*quoting Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976)). Defendants presented expert testimony characterizing the dioxin risks as minimal, and although plaintiff's experts, who sounded a strong warning regarding dioxin risks at even low doses, were also highly qualified, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 378, 109 S.Ct. at 1861. *Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1527 (10th Cir.1992). Although plaintiffs challenge the certainty with which the defendants' experts were able to support their opinions regarding the low level of the dioxin risks, the court finds that the effect of the arguments raised is simply to emphasize the lack of definitive information available. *See* REC Report at 66–64 ("Large uncertainties exist in estimates of exposure, dose, background, and hazard or risk.... The general knowledge of hazardous waste incinerators as a source of dioxins has changed little since the early 1980s."). The court finds that the Army has carefully reviewed the dioxin issue and its current uncertainties, and that the Army's evaluation of the significance of the asserted new information is not arbitrary or capricious.

*Existence of alternative technologies.*

13. Plaintiff's argument that the Army must prepare a supplemental EIS to consider recent developments in alternative technologies would also require the court to accept a controversial factual position. The court would have to accept plaintiffs' factual argument that these technologies present a reasonable alternative that can be implemented immediately, even though the Army's experts have explicitly found otherwise. As with the dioxin issue, the readiness of these technologies is an issue that is not definitively resolved, and the expert testimony is con-

tradictory. Because of the inherent time pressures in disposing of the chemical weapons stockpile, these technologies would have to be an immediate option in order to be significant: At the very least, even assuming the most optimistic schedules, implementation of the most promising of these alternatives will take several years, and the court cannot say that the Army is wrong in deciding that the risks of additional storage time outweigh the possible advantages that alternative technologies offer. In light of the deference to be given to the agency's evaluation of the issue, both through the testimony of its experts at the hearing and in the REC, the court holds that the Army's decision that these alternative technologies have not progressed sufficiently to require a supplemental EIS is not arbitrary and capricious.

*Compliance with TSCA*

14. Under EPA regulations promulgated under TSCA, all incinerators are required to destroy PCBs and PCB-containing materials so that no more than one part in a million leaves the incinerator stack. 40 C.F.R. § 761.70(b)(1). This is the equivalent of the RCRA requirement of a 99.9999% DRE. Plaintiffs claim that defendants have failed to show that they are able to meet this standard for the DFS incinerator at TOCDF which will destroy the rocket tubes which contain PCBs.

15. As noted above, TOCDF has completed a test burn of PCB-containing rocket tubes and met the regulatory standard. Because the PCB characteristics of the agent-containing rockets to be processed will be similar to those previously incinerated, defendants claim that the proposed operation of TOCDF will meet the 99.9999% DRE required under TSCA.

16. While acknowledging that TOCDF is able to meet the required DRE for PCBs in concentrations of over 1,000 parts per million (ppm), plaintiffs argue that many of the PCBs to be incinerated are in lower concentrations, and that defendants have not shown that the 99.9999% DRE can be achieved for such. Plaintiffs have pointed to studies which indicate that it is impossible for any incinerator to achieve a 99.9999% DRE for

concentrations below 100 ppm. However, Mr. Rick Holmes, the associate project manager for TOCDEF, testified that he had calculated that the TOCDF furnace could meet the required DRE even if feed concentrations were as low as 300 ppm. Accordingly, the court finds that plaintiffs have not shown a likelihood of success on the merits of their claim that there is an existing or threatened future violation of TSCA.

*Nuisance*

█ 17. The court has previously granted the Federal defendants' motion to dismiss this claim on the basis of immunity. Defendant EG & G has also moved to dismiss this count. The court finds that plaintiffs' allegations with regard to their nuisance claim are inadequate. "Under Utah law, [plaintiffs] must suffer some substantial injury or damage not inflicted on the community at large in order to recover on a public nuisance theory." *Hardy Salt Co. v. Southern Pacific Transportation Co.*, 501 F.2d 1156, 1164 (10th Cir.1974).[4] The complaint fails to specify the nature of the particularized in jury that individual plaintiffs will suffer as a result of the proposed operation of TOCDF by EG & G. Indeed, based on the general environment-related complaints which form the basis of plaintiffs' suit, it does not appear likely that plaintiffs will be able to allege injury which would be different in nature from that would be suffered by the public in general. To the extent that plaintiffs' assertion of likely injury is based upon alleged increases in pollutant levels, the court finds that such injury, if it exists, would not be different from that which is suffered by the general public. Accordingly, the court will grant defendant EG & G's motion to dismiss the nuisance claim, although the court will allow plaintiffs to amend their complaint to reassert this claim should particular plaintiffs be able to allege individualized injury due to the operation of TOCDF.

**Conclusion**

In light of the above analysis, the court finds that plaintiffs have failed to show that

they will be irreparably harmed during the pendency of this action and that the relatively minor interest in preserving an opportunity for NEPA documents to be prepared pending a final ruling in this case is insufficient to justify injunctive relief. The court also finds that plaintiffs have failed to show a sufficient likelihood of success on the merits to support a preliminary injunction. Plaintiffs' motion for a preliminary injunction is therefore DENIED. In addition, the court finds that defendant EG & G's motion to dismiss plaintiffs' nuisance claim is granted *without prejudice.*

IT IS SO ORDERED.

---

**4.** To the extent that plaintiffs are asserting a private nuisance theory, they have failed to specify how the operations of TOCDF would affect individual plaintiffs' interest in land. *See Turnbaugh v. Anderson*, 793 P.2d 939, 942–43 (Utah Ct.App.1990).